**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**FRED ALLEN,**

       **Plaintiff,**

                                 **Civil Action 2:13-cv-00510**
     **v.**                          **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## OPINION AND ORDER

Plaintiff, Fred Allen, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the Court for consideration of Plaintiff's Statement of Specific Errors (ECF No. 10), the Commissioner's Memorandum in Opposition to Plaintiff's Statement of Errors (ECF No. 12), Plaintiff's Reply (ECF No. 16), and the administrative record (ECF No. 11). For the reasons that follow, the Commissioner's decision **REVERSED** and the case is **REMANDED**.

### I.      BACKGROUND

Plaintiff filed his applications for disability and supplemental security income benefits on April 12, 2010, alleging that he has been disabled since February 1, 2010, at age 50. (R. at 18, 23.) Plaintiff's application was denied initially and upon reconsideration. (R. at 18.) Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). (*Id.*) Administrative Law Judge, Nino A. Sferrella, ("ALJ") held a hearing on March 22, 2012, at which Plaintiff was represented by counsel. (R. at 34–66.) A vocational expert, Dr. Michale Klein, ("VE") also

appeared and testified. (R. at 62–6.)  On April 16, 2012, the ALJ issued a decision finding that Plaintiff was not disabled. (R at 18–27.)  The Appeals Council denied Plaintiff's request for review and adopted the ALJ's determination as final. (R. at 1–3.)  Plaintiff then timely commenced this action.

## II.  PLAINTIFF'S TESTIMONY

At the hearing, Plaintiff testified that he was 52 years old and single. (R. at 37.)  He received his GED while in prison. (*Id.*)  He performed masonry work from 1996 until 1998 or 1999 when he began driving trucks for a living. (R. 44–5.)  He described driving trucks for different companies until February of 2009 or 2010. (R. 43–4.)  He stated that he stopped working as a truck driver at that time because his legs hurt. (R. at 44.)  He denied telling a doctor that he was still driving a dump truck part time in 2012 and testified that he performed no work for pay after he quit driving trucks in 2009 or 2010. (R. 39–41.)  Plaintiff asserted that his leg pain had gotten worse since its onset. (R. at 50–51.)  He agreed that his leg pain prevented him from being on his feet for very long and stated that sitting for long periods caused him back problems. (R. at 52.)

Plaintiff was diagnosed with hepatitis C in 2008 and diabetes in 2003. (R. at 45–46.)  He was initially prescribed insulin for his diabetes but was later prescribed several other medications, including Metformin and Humalog. (R. 46–47.)  In 2010, while he was taking multiple doses of insulin, Plaintiff had trouble remembering to take his blood pressure pills. (R. at 54.)  Plaintiff stated, however, that his doctor now thought that Plaintiff was doing "pretty good" with regard to controlling his diabetes. (*Id.*)  Plaintiff checks his sugar twice a day.  (*Id.*)  Test results vary depending upon what he eats but he needs to watch his diet.  (*Id.*)

Plaintiff related that he began to experience problems with his legs "a little over a couple of years" before the hearing. (R. at 47, 50–51.)  Plaintiff explained that he had pain in his knees, calves, and lower thighs. (R. at 48, 51.)  He agreed that there had not been a medical determination made about what was causing his leg issues. (R. at 50.)  Plaintiff admitted to taking more medicine than prescribed for his leg pain and that his doctors changed his medications after he informed them that he was using codones in this manner. (R. at 50.)  He also admitted to a history of drug abuse but stated that his abuse was related to his pain and that he had stopped abusing drugs about six months prior to the hearing.  (R. at 53.)  He also testified that was enrolled in a rehab program within the last two year.  (R. at 53.)

Plaintiff sought mental health services after his Father and Uncle, both diabetic, passed away in January and February of 2012, respectively. (R. at 58.)  He reported that he sought such services because his mind was "going downhill" and he sometimes felt suicidal.  (*Id.*)

### III.     MEDICAL RECORDS

**A.     Plaintiff's Physical Impairments:**

**1.     Treatment Records from Drs. Black, Buller, Niehaus-Sauler, and Jilani**

Plaintiff received treatment from Dr. Black at Nationwide Children's Hospital for at least nine months before his alleged onset date of February 1, 2010.  Dr. Black's records indicate that Plaintiff sought treatment in May of 2009 for erectile dysfunction that caused him to be distraught and tearful. (R. at 223.)  Dr. Black noted that Plaintiff presented with poorly controlled diabetes, hepatitis C, and hypertension.  (*Id.*)  Dr. Black wrote that Plaintiff had not seen a doctor for over a year at that point after he lost insurance benefits. (*Id.*)  At that, and subsequent visits, the treatment records reflect that Plaintiff's general appearance was good and

that he did not present with symptoms of acute distress. (R. at 225, 235, 247, 240, 263, 317, 335, 490, 477.)

While under Dr. Blacks' care, the records consistently note that Plaintiff's diabetes remained poorly controlled before and after his alleged onset date, and that his compliance with treatment was limited, his diet erratic or unhealthy, and that he struggled with the tenets of diabetes management. (R. at 235, 239, 241, 245, 255, 316, 323, 490, 476.)  At several visits, the records reflect that Plaintiff was not taking his medications or checking his blood sugar regularly (R. at 253, 316, 332, 335, 488, 476.)  The records also indicate that Plaintiff admitted to taking medications prescribed to his Father, even though he was advised not do so, and changing the doses of the diabetic medications that had been prescribed to him (R. at 253, 211.)

On February 5, 2010, after the alleged date of onset, Dr. Black wrote that Plaintiff complained of: "Leg pain - deep achy pain in lower extremities. Bad at night, not with activity not relieved by sitting."  (R. at 261.)  On April 9, 2010, Plaintiff described the leg pain as a "constant throbbing" like "when you have the flu."  (R. at 272.)  The records indicate that the cause of Plaintiff's leg pain was unclear. (R. at 214.)  On November 5, 2010, Plaintiff reported still having pain in his lower legs localized in his knee joints, but denied any swelling. (R. at 316.)  Dr. Black wrote that Plaintiff's pain had been well managed with medication. (*Id.*)  On January 21, 2011, Plaintiff continued to complain of throbbing leg pain that was worsened by sitting or walking and described back pain. (R. at 318.)  It was again noted that the cause of the leg pain was still unclear but that it could have been related to neuropathy from the hepatitis C or diabetes, vascular issues, or lumbar spinal stenosis. (R. at 333.)  The records reflect that Plaintiff's gait was nevertheless normal at these visits. (R. at 263, 318, 333, 490, 477.)

Dr. Black did not prepare a report regarding Plaintiff's residual functional capacity.  He

did, however, provide a letter on February 11, 2011 that stated as follows:

> I have the pleasure to care for the patient Fred Allen.  Mr. Allen has been a patient
> of mine for almost 18 months now.  He has a number of chronic medical
> conditions which affect him on a daily basis.  The degree of his limitations
> include but are not limited to frequent medical appointments, regular laboratory
> checks, intensive home medication regimens, chronic daily pain and consultation
> visits, Mr. Allen has always been reliable in keeping his appointments in spite of
> these burdens. In addition to this he states that he is in charge of the medical care
> of his elderly infirm mother, although I cannot directly confirm this as she is not a
> patient of mine.  In spite of his best attempts at coordinating all these tasks Mr.
> Allen has had some difficulty in accomplishing all of his required tasks, such as
> paper work.  I truly believe this is due to the burden of his responsibilities. I do
> appreciate any effort you may be able to afford him in revisiting his disability
> appeal, in spite of him not completing the paperwork in a timely fashion.

(R. at 342.)

Plaintiff also received treatment from Drs. Buller and Niehaus-Suller at Nationwide

Children's Hospital on June 20, September 8, and September 30, 2011.  (R. at 465–472, 454–

464, 446–452.)   At all three visits, both doctors wrote that Plaintiff's diabetes was generally not

under control and that he was non-compliant with his medications and blood sugar tests for

diabetes. (R. at 469, 450, 459.)  At the June 20 and September 8 visit, Dr. Buller also noted that

Plaintiff had tested positive for cocaine. (R. at 467, 459.)  Plaintiff stated that someone had put

something in his juice to help him with his knee pain after it was X-rayed. (R. at 467.)  At the

June visit, Plaintiff also stated that he had difficulty with walking.  Dr. Buller, however, noted

that his gait was "stable and balanced," that Plaintiff had no crepitus in either knee, and that

Plaintiff scored well on a strength test of his lower extremities. (R. at 467, 468.) At the

September 8 visit, Dr. Buller noted that Plaintiff's knee pain had reportedly improved with a

cortisone shot although his low back pain was reportedly worse with weather changes. (R. at

456, 459.)  Similarly, Dr. Niehaus-Suller wrote on September 30, that Plaintiff thought his knee

pain had improved with a cortisone injection, but that Plaintiff had not received any subsequent injections. (R. at 448.)

On June 20, 2011, Dr. Buller also reviewed X-rays of Plaintiff's knees. (R. at 469.) The X-rays revealed no joint effusion or soft tissue swelling, fractures or dislocations in either knee. (*Id.*) Both knees did have minimal osteophytosis. (*Id.*) The left knee had vascular calcifications, and tiny ossifications suggestive of a remote MCL injury. (*Id.*) The right knee had normal bony mineralization. (*Id.*)

The record contains treatment notes from Dr. Jilani at Nationwide Children's Hospital from November 2011 until February of 2012. (R. at 437.) On November 4, 2011, December 2, 2011, January 13, 2012, and February 10, 2012, Dr. Jilani noted that Plaintiff's diabetes was uncontrolled although lab tests showed that Plaintiff had become more compliant with his medications around December 2, 2011. (R. at 440, 418, 427, 408–409.) At several visits, Plaintiff told Dr. Jilani that he experienced knee pain relief with cortisone injections but had not been back to receive additional injections. (R. at 438, 428, 409.) The treatment records from every visit with Dr. Jilani reflect that Plaintiff had tenderness with palpitation to the knees but there was no erythema, edema, effusion, signs of infection, or limits to Plaintiff's range of motion. (R. at 440, 417, 427, 408.) The treatment records from every visit also reflect that Plaintiff's knee pain was stable and there was no increased pain. (R. at 440, 428, 418, 409.) On January 19, 2012, Dr. Jilani wrote that Plaintiff was grieving the loss of his Father in addition to other feelings of depression about his medical conditions. (R. 418–419.) Plaintiff planned to seek counseling. (*Id.*)

On February 12, 2012, Dr. Jilani completed a "Medical Assessment of Pain and Fatigue" form. (R. at 345–347.) In it, Dr. Jilani indicated that he had treated Plaintiff for chronic knee

pain secondary to osteoarthritis of the knees, diabetes, hypertension, and hyperlipidemia since September of 2011. (R. at 345.)  Dr. Jilani wrote that although Plaintiff suffered from pain and fatigue that would prevent him from working in a competitive work environment, he reasonably expected Plaintiff's pain or fatigue to improve with further treatment or time, specifically, physical therapy and cortisone injections.  (*Id*.)  Indeed, Dr. Jalani opined that Plaintiff required regular corticosteroid injections.  (R. at 347.)  He agreed that Plaintiff's symptoms were reasonable and that he was not a malingerer. (R. at 345.)  He opined that Plaintiff could sit for about four hours at one time without resting, and stand or walk for less than two hours without resting. (R. at 346.)   He further opined that Plaintiff could lift up to ten pounds occasionally but never lift more than that and that Plaintiff could not be reasonably expected to be reliable about attending eight hour work days, forty hours a week. (*Id.*)  He also advised Plaintiff to ice his knees for his pain.  (R. at 347.)  Nevertheless, he did not believe that Plaintiff's concentration was adversely impacted by pain or fatigue or that pain impacted Plaintiff's ability to use his hands or manipulate items.  (R. at 346.)

### 2.  State Agency Physician, Walter Holbrook, M.D.

On July 29, 2010, state agency physician, Dr. Holbrook, reviewed Plaintiff's file and assessed his residual functional capacities. (R. at 278–284).  Dr. Holbrook opined that with regard exertional limitations, Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds. (R. at 279).  He also opined that Plaintiff could stand or walk or sit for about 6 hours in an 8 hour workday.  (*Id.*)  He further opined that Plaintiff had no pushing or pulling limitations and that Plaintiff could frequently balance and occasionally climb ramps or stairs, stoop, kneel, and crawl. (R. at 279–280.)  With regard to postural limitations, Plaintiff could never climb ladders, ropes or scaffolds, or crouch and should avoid even moderate exposure to hazards such

as machinery and heights. (R. at 280, 282.)  He opined that Plaintiff had no manipulative, visual, or communicative limitations. (R. at 281–282.)  He found Plaintiff's allegations to be mostly credible. (R. at 283.)  He did not give any weight to Plaintiff's treating physician, Dr. Black, because Dr. Black never provided a statement regarding Plaintiff's physical capabilities. (R. at 284.)  Dr. Holbrook's assessment was reviewed and affirmed by state agency physician W. Jerry McCloud, M.D. (R. at 343).

## B.      Plaintiff's Mental Impairments

### 1.      Evaluating Psychologist, Scott Lewis Donaldson, Ph.D.

On August 5, 2010, state agency psychologist Scott Lewis Donaldson consultatively evaluated Plaintiff and assessed his mental functional capacities.  (R. at 286–290.)  Dr. Donaldson interviewed Plaintiff about his work, family and health histories. (*Id.*)  Plaintiff admitted to participating in alcohol and drug counseling and described medications he had been prescribed in the past. (R. at 286.)  He stated that he was not dependent upon alcohol and had not used cocaine or marijuana in the past four years but currently participated in a drug treatment regimen at South East Mental Hospital. (*Id.*)  Plaintiff reported working out on his bike, drinking coffee and watching television. (R. at 289.)  He also reported cooking, cleaning with help, doing laundry, shopping monthly, and leaving home two or three times a week. (*Id.*)  He lives with his mother, has a few friends and likes fishing. (*Id.*)

Dr. Donaldson wrote that Plaintiff was appropriately dressed and his hygiene and grooming were adequate.  (R. at 287.)  Plaintiff reportedly understood the purpose of the examination.  (*Id.*)  Plaintiff's speech fell within normal limits and he did not manifest evidence of flights of ideas or loose associations. (*Id.*)  Plaintiff's affect was not, however, appropriate and instead appeared flat and agitated. (*Id.*)  Plaintiff appeared to relax as the interview went on and

he established a "cautious rapport." (*Id.*)   Symptoms of mania were reported and observed. (*Id.*)  Plaintiff was alert and oriented to person, time, and place.  (R. at 288.)   He did not appear confused and his memory was intact. (*Id.*)  His ability to perform mental arithmetic and reason abstractly were on par with his other cognitive skills; he appeared to be of normal intelligence although Dr. Donaldson opined that Plaintiff's awareness of the world around him may be limited. (*Id.*)  Dr. Donaldson wrote that Plaintiff's judgment may also be limited and he may need assistance making important decisions about his future, conducting living arrangements, and managing funds.  (*Id.*)

Plaintiff described having a normal appetite but trouble falling and staying asleep, and reported napping during the day.  (R. at 288.)  He reported weeping about twice a month and having protracted feelings of guilt about prison.  (*Id.*)  He also experienced feelings of hopelessness, helplessness, and worthlessness on occasion and described symptoms indicative of a mood disorder, such as diminished interest in activities, insomnia, and fatigue.  (*Id.*)  He did not, however, experience suicidal or homicidal ideation.  (*Id.*)  He reported that his kids keep him feeling strong and that he enjoyed spending time with his daughter. (*Id.*)  Dr. Donaldson opined that Plaintiff suffered from situational anxiety and worry which makes him restless and edgy, but without panic-like symptoms.  (*Id.*)  He did not have hallucinations or delusions but did obsess about his lack of sex drive. (*Id.*)

Dr. Donaldson diagnosed Plaintiff with generalized anxiety disorder, polysubstance dependence in full remission, and bipolar disorder. (*Id.*)  Dr. Donaldson opined that Plaintiff's ability to understand remember and carry out one or two step job instructions may not be impaired. (*Id.*)  His ability to perform repetitive tasks is not impaired although his motivation, ability to attend to relevant stimuli, and to withstand stress and pressures associated with day-

today work activities may be moderately impaired. (*Id.*)  His interpersonal skills and the ability to relate to supervisors and coworkers appear to be mildly limited. (*Id.*)  Dr. Donaldson's assessment was reviewed and affirmed by state agency psychologist Deryck Richardson.  (R. at 344).

### 2.    Reviewing Physician, Paul Tangeman, M.D.

On August 18, 2010, state agency psychologist, Paul Tangeman, reviewed Plaintiff's file, including Dr. Donaldson's consultative evaluation. (R. at 292–308.)  He opined that Plaintiff had moderate limitations in three areas: 1) the ability to maintain attention and concentration for long periods of time; 2) the ability to complete normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of interruptions; and 3) the ability to respond appropriately to changes in the work setting. (R. at 292–293.)  He further opined that Plaintiff's social skills are generally appropriate for everyday interaction, his cognition is intact, and Plaintiff was independent in all activities of daily living. (R. at 294.)  Plaintiff's allegations of depression were credible but Plaintiff retained the ability to perform simple to complex work with limited production standards. (*Id.*)  Dr. Tangeman's assessment was reviewed and affirmed by state agency psychologist Deryck Richardson.  (R. at 344).

### III.   VOCATIONAL EXPERT EVIDENCE

### A.   The Vocational Expert Testimony

The VE testified that Plaintiff's past relevant work as a truck driver was semi-skilled and was performed at both medium and heavy levels of exertion.  (R. at 62–63.)  He also testified that Plaintiff did not possess any skills that were transferable to light or sedentary work. (R. at 63.)

The ALJ did not pose any hypothetical questions to the VE.  (R. at 62–65.)  Instead, the ALJ asked the VE to examine the RFCs prepared by several doctors.  Specifically, the ALJ asked the VE to consider the RFC prepared by non-examining state agency physicians Walter Holbrook, M.D. and Paul Tangeman, Ph.D. (R. at 63.)

> Q:  So the – we've got a state agency for light in [the physical RFC prepared by Dr. Holbrook], that would not disable him if I accept that.
>
> A: No.
>
> Q:  Do you see anything in [the mental RFC prepared by Dr. Tangeman] that would help the claimant? His not being able to do any kind of work, that's [Dr. Tangeman's RFC], the review, mental functional capacity, 8/8/10.
>
> A:  They conclude that he retains the ability to perform simple and complex work task (sic) with limited production standards. I believe all of his past work required the ability to have some level of production and they were semi-skilled and complex. So I don't think –
>
> Q:  It would rule out all unskilled work?
>
> A:  I don't believe it would, not this RFC. But I think it would allow – I think it would preclude the work that he did.

(*Id.*)  The VE did not testify about what type and how many jobs there were that could be performed by an individual with the limitations contained in contained in these two RFCs.

## B.  The Vocational Analysis

The record contains a one page Vocational Analysis prepared by state agency vocational specialist, Moriah Keith, on September 9, 2010. (R. at 177.)  The analysis provides, in relevant part:

> [Plaintiff] is 50 years old and closely approaching advanced age currently and at his [alleged onset date]. He has a GED. His RFC states that he could lift 20 pounds occasionally and 10 pounds frequently.  He could walk, stand, or sit for 6 hours/day.  He could occasionally climb ramps and stairs, stoop, kneel, and crawl. He could frequently balance.  He could never climb ladders, ropes, or scaffolds or crouch.  He must avoid even moderate exposure to hazards.  His [mental RFC]

states that he could perform simple to complex work with limited production standards.

Additional information would be required to make determinations at steps 4a and 4b such as what types of trucks he drove; however, even if this information were obtained, vocational rule 202.14 guides a finding that the claimant is not disabled at step 5.  He has an RFC for a wide range of light work and there are no physical or mental non-exertional limitations that would significantly erode the light occupational base.

The following occupations are within the claimant's RFC and [mental RFC]:

Photocopying-Machine Operator (clerical and kindred) 207.685-014
Marker (retail trade) 209.587-034
Waxer (glass products) 779.687-038

These jobs exist in sufficient numbers in the general economy such that a job adjustment is reasonable.

(*Id.*)

## IV.    THE ADMINISTRATIVE DECISION

In his April 16, 2012 determination, the ALJ found that Plaintiff had the following impairments that, taken collectively, are severe: hepatitis C, diabetes mellitus, a depressive disorder, an anxiety disorder, and polysubstance abuse. (R. at 21.)  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (*Id.*)  The ALJ set forth Plaintiff's residual functional capacity ("RFC") in the written determination as follows:

After careful consideration of the entire record, I find that [Plaintiff] has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) . . . .  Specifically, [Plaintiff] is further precluded from all work involving frequent crouching, or climbing ladders, ropes, or scaffolds.  He can balance frequently, and he can occasionally climb ramps and stairs.  He can stoop kneel, and crawl no more than occasionally .  .  . He retains the ability to perform simple to complex work tasks with limited production standards . . . .

Based upon the VE's testimony, the ALJ found that Plaintiff could not perform any of his past relevant work and had not acquired any job skills that could be transferred to sedentary or light work. (R. at 25.)  The ALJ also noted that Plaintiff was approaching advanced age at the alleged date of onset, had a high school education and could communicate in English.  (R. at 25.)  The ALJ explained that he needed to consider these findings in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, to determine if Plaintiff could successfully adjust to other work.

The ALJ wrote:

> If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, medical-vocational rules direct a finding of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile . . .  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or he has nonexertional limitations, the medical-vocational rules are used as a framework for decisonmaking unless there is a rule that dictates a finding of "disabled" without considering the additional exertional/nonexertional limitations . . .

 (R. at 26).  The ALJ explicitly stated that pursuant to his RFC determination, Plaintiff was unable to perform a full range of light work, and thus acknowledged that the medical-vocational guidelines were merely a framework for determining if Plaintiff could adjust to other work.  (*Id.*)  Because they were merely a framework, the ALJ explicitly stated that he would rely upon the VE testimony to determine the extent to which Plaintiff's limitations eroded the unskilled light occupational base.  The ALJ wrote:

> If [Plaintiff] had the residual functional capacity to perform the *full* range of light work, a finding of "not disabled" would be directed by the Medical-Vocational Rule 202.15.  However, [Plaintiff's] ability to perform all or substantially all of the requirements of this level of work has been impeded by some additional limitations.  To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and residual functional capacity.

> The vocational expert replied that given these factors, the individual would be able to perform the requirements of a wide range of unskilled work at the light exertional level.

(*Id.*)  Despite this passage in the determination, the ALJ did <u>not</u> ask the VE whether jobs existed in the national economy for an individual with Plaintiff's background and RFC.  Nor did the VE ever testify that an individual with Plaintiff's profile would be able to perform the requirements of a wide range of unskilled work at the light exertional level.  These statements do appear, however, to be consistent with the Vocational Analysis provided by Moriah Keith on September 9, 2010.

## V.     STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial

evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    LEGAL ANALYSIS

Plaintiff raises several assignments of errors.  First, Plaintiff essentially argues that substantial evidence does not support the ALJ's finding that he is able to perform other work significantly available in the economy despite his impairments.  Plaintiff also asserts that the ALJ erred by improperly assessing medical opinion evidence and by failing to find that Plaintiff's knee and leg impairment were severe.

### A.    Decisional Framework

In determining whether a claimant is disabled, ALJs are required to perform a five-step analysis:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found disabled.

3. If the claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.) he is not disabled.

*Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

At the fifth step, "[a]n ALJ is to employ the grids, found at 20 C.F.R. Part 404, Subpart P, Appendix 2." *Id.* at 423. The grids provide a series of vocational patterns and direct conclusions of either "disabled" or "not disabled" when the facts match the pattern. 20 C.F.R. Part 404, Subpart P, Appendix 2 § 200.00. Where the characteristics of the claimant exactly match the characteristics in one of the rules, the grid determines whether significant numbers of other jobs exist for the person or whether that person is disabled. *Wright v. Massanari*, 321 F. 3d 611, 615 (6th Cir. 2003) (citing *Hurt v. Sec. of Health & Human Servs.,* 816 F.2d 1141, 1142–43 (6th Cir.1987) (per curiam). However, in this case, where Plaintiff's impairments do not precisely match any specific rule, his residual functional capacity (light work with additional nonexertional restrictions) must be used as the appropriate framework to determine whether he is disabled. *Id.* (citing *Kirk v. Sec. of Health & Human Servs.,* 667 F.2d 524, 530 (6th Cir. 1981) ("A claimant's capacity to perform work must be evaluated in light of his age, his education, his work experience, and his impairments, including his pain.") (internal citation omitted)).

In addition, "[d]ifferent evaluative frameworks apply to claimants with exertional and nonexertional limitations." *Jordan,* 548 F.3d at 423. Exertional limitations are limitations on a claimant's ability to meet the strength requirements of a job, such as carrying, lifting, and pulling. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). On the other hand, nonexertional limitations are limitations that affect the claimant's ability to meet the job demands other than strength, such as anxiety or difficulty concentrating. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). The United

States Court of Appeals for the Sixth Circuit has acknowledged the general rule that when "a claimant has nonexertional impairments alone or in combination with exertional limitations, the ALJ must treat the grids as only a framework for decisionmaking, and must rely on other evidence to determine whether a significant number of jobs exist in the national economy that a claimant can perform. *Jordan*, 548 F.3d at 424 (citing *Burton v. Sec'y of Health & Human Servs.,* 893 F.2d 821, 822 (6th Cir. 1990)). Indeed, in such circumstances, it is typical for an ALJ to rely upon VE testimony as other evidence to make that determination.

### B.      The ALJ's Analysis at Step Five

In this case, when the ALJ considered the grids, he noted that grid rule 202.15, from the light work table, would direct a finding of "not disabled" if Plaintiff "had the residual capacity to perform the *full* range of light work." (R. at 26.); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.15 (requiring a finding of disabled for persons closely approaching advanced age, with a high school education, and transferrable skilled or semi-skilled work experience).[1] Nevertheless, the ALJ acknowledged that Plaintiff could not perform a full range of light work because he had additional limitations. (*Id.*) Accordingly, the ALJ stated that he elicited and relied upon testimony from the VE about whether jobs existed in the national economy that an individual with Plaintiff's profile could perform. (*Id.*) The ALJ wrote that the VE testified that an individual with Plaintiff's profile would be able to perform a "wide range of unskilled work at the light exertional level." (R. at 26.) But as noted previously, the ALJ did not elicit such testimony— the VE never testified at all about these points. At most, the VE testified that the limitations in the ALJ's RFC, "would not rule out all unskilled work." (R. at 63.)

---

[1] The ALJ likely intended to reference 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.14, which also directs a finding of "not disabled" for persons closely approaching advanced age, with a high school education, and non-transferrable skilled or semi-skilled work experience.

What appears to have occurred is that the ALJ relied instead upon the Vocational Analysis prepared by Moriah Keith on September 9, 2010, which contains the same statements found in the ALJ's analysis at step five. (R. at 26, 177.)  The question then is whether the opinion of a state agency vocational specialist can be relied upon in this manner.  The Court concludes that it cannot.

"Social Security Ruling 00–4p clarifies that vocational experts are individuals who provide testimony before ALJs and vocational specialists provide evidence to adjudicators at the state agency disability determination services." *Jimenez–Cruz v. Astrue,* No. 09–1812, 2012 WL 1207387, at *14 n.10 (D. Puerto Rico April 11, 2012); SSR 00–4p, 2000 WL 1898704, at *1. Notably, "[n]either the SSA's rules, policies nor practices require that [vocational specialists possess] qualifications the same as or similar to those of the vocational experts who advise administrative law judges at higher levels of SSA's disability claim review." *Laird v. Stilwill,* 969 F.Supp. 1167, 1177 (N.D. Iowa 1997).  Here, however, the administrative record in the present case never identifies the qualifications possessed by vocational specialist Moriah Keith or the method she used to perform her Vocational Analysis. (R. at 177.)

Plaintiff's opportunity for cross-examination would also be curtailed if an ALJ could rely upon an opinion offered by a state agency vocational specialist instead of a VE.  Whenever a VE provides testimony or written responses to interrogatories at the hearing level, the claimant "has the right to review and respond to the [vocational expert] evidence prior to the issuance of a decision." SSR 96–9p, 1996 WL 374185, at *10 n.8. No such protections exist at the agency level.

In light of these considerations, the Court finds that substantial evidence fails to support the ALJ's finding at step five of the sequential analysis.  Given that Plaintiff is not able to

Case: 2:13-cv-00510-EPD Doc #: 19 Filed: 09/24/14 Page: 19 of 21  PAGEID #: 616

perform the full range of jobs within the specified category (light), additional evidence was required to adequately support the ALJ's determinations at step five.  Importantly, "where [vocational expert] testimony is offered, there must be an opportunity for review and response under the regulations.  Without [P]laintiff having had this opportunity, the vocational analysis cannot be treated as a substitute for VE testimony." *Spagnola v. Astrue*, No. 09-CV-10846, 2010 WL 4181162, at *5 (D. Mass. Oct. 19, 2010) (internal citations and quotation marks omitted); *see also Cohoon v. Astrue,* No. CV–10–1219–HZ, 2011 WL 3841568, at *11 (D.Or. Aug. 30, 2011) (holding that, even where a state agency vocational specialist and her qualifications were identified, reliance on her opinion was not appropriate at the hearing level).

## C.       The Commissioner's Alternative "Method of Proof"

The Commissioner asserts that the ALJ's determination is supported by substantial evidence.  The Commissioner claims that although an ALJ typically relies upon VE testimony to prove that significant numbers of jobs exist in the economy, an ALJ may instead use the Medical-Vocational Guidelines to prove that point when a claimant can perform a wide range of jobs at a particular level.  (ECF No. 15, at 4.)  This is because the grid contains accepted administrative findings about the availability of jobs for people who can perform a full range of work at a particular level.  *Kirk*, 667 F.2d at 535 ("When the claimant does indeed match one of the grid's patterns, then all the grid does is announce that substantial gainful work in the national economy is available for that particular individual; in other words, once a finding is made that the individual can do light work, for example, the grid operates to declare that light work is available.")  The Commissioner argues that consequently, substantial numbers of jobs will also be available to people who can do a wide range of work at a particular level.  *Id.* at 529.

Nonetheless, the ALJ mistakenly indicated that the VE testified that Plaintiff could perform a "wide range of unskilled work at the light exertional level."  (R. at 26.)  The VE, however, offered no such testimony.  Thus, assuming that the ALJ could use the guidelines to establish that there are significant numbers of jobs for persons who can perform a wide range of work at the light exertional level, the ALJ did not rely upon substantial evidence to determine that Plaintiff is a person who can perform a wide range of work at the light exertional level.

The cases cited by the Commissioner are unavailing.  None of them involves an instance where an ALJ purported to rely upon VE testimony that was not elicited.  For instance, *Zeigler v. Sullivan* is cited for the proposition that VE testimony is not required when a claimant's nonexertional limitations do not preclude a "wide range" of work at an exertional level. (ECF No.15, at 5.)  1990 WL 6954 (6th Cir. 1990).  In *Zeigler*, however, the ALJ specifically found that the grid, specifically, grid rule 201.21, was applicable and thus opted to rely upon it because the claimant's capacity to perform a wide range of sedentary work was not impeded by additional nonexertional limitations.  *Id*. at *2.   Indeed, the court essentially found that the ALJ in that case determined that the Plaintiff could perform substantially all of the requirements for sedentary work. *Id.*  Here, in contrast, the ALJ determined that the grid, specifically, grid rule 202.15, did not apply because Plaintiff's claimant's ability to perform all or substantially all of the requirements of light work was impeded by additional limitations.  (R. at 26.)

Similarly, the Commissioner cites *Kirk* for the proposition that "the Sixth Circuit has expressly rejected the notion that 'any allegation of nonexertional limitations' demand use of vocational testimony."  (ECF No.15, at 5.)  667 F.2d at 530.  In that case however, the ALJ found that the claimant's nonexertional limitations were "insufficiently severe to alter the conclusion that the claimant could do a full range of light work."  *Id.*  Here again, however, the

ALJ found that Plaintiff's additional limitation did prevent him from performing a full range of light work.  (R. at 26.)

Moreover, even if the Commissioner were correct that the ALJ can rely on the guidelines instead of VE testimony, it is not clear in this case that the ALJ did so.  Indeed, it is not entirely clear what the ALJ relied upon because he cited testimony that was not proffered.  That alone prevents this Court from performing meaningful review and militates in favor of remand.

### VII.    DISPOSITION

In sum, the ALJ's step five determination is not supported by substantial evidence.  This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error.  Thus, the Court need not, and does not, resolve whether the alternative basis Plaintiff asserts support reversal and remand.   Accordingly, the Commissioner's decision is **REVERSED.**  The case is **REMANDED** for a rehearing pursuant to Sentence Four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  September 24, 2014                          _/s/ *Elizabeth A. Preston Deavers*
                                                  Elizabeth A. Preston Deavers
                                                  United States Magistrate Judge